IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

HEAVY EQUIPMENT MOVERS
AND INSTALLATION, LLC                                        PLAINTIFF

v.                                                   CAUSE NO. 1:24CV61-LG-RPM

CALGON CARBON CORPORATION                                    DEFENDANT

**MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF'S
MOTION TO RECONSIDER, PLAINTIFF'S MOTION FOR
INTERLOCUTORY APPEAL, AND DEFENDANT'S
SECOND MOTION FOR SUMMARY JUDGMENT**

Plaintiff Heavy Equipment Movers and Installation, LLC, ("HEMI") filed this lawsuit against Calgon Carbon Corporation, seeking to foreclose on a statutory lien it placed on Calgon's property. HEMI has filed a [113] Motion for Reconsideration of the Court's [105] Memorandum Opinion and Order Concerning the Parties' Motions for Summary Judgment. In the alternative, HEMI asks the Court to certify its [105] Memorandum Opinion and Order for interlocutory appeal. Calgon has also filed a second [131] Motion for Summary Judgment based on new testimony obtained during discovery. After the parties fully briefed Calgon's Motion, the Court granted HEMI's [142] Motion for permission to file a [144] Sur-Reply. The Court also permitted Calgon to file a [145] Response to the Sur-Reply. After reviewing the submissions of the parties, the record in this matter, and the applicable law, the Court finds that: (1) HEMI's Motion for Reconsideration should be denied; (2) HEMI's Motion for Interlocutory Appeal is moot; and (3) Calgon's second Motion for Summary Judgment should be granted.

## BACKGROUND

Calgon retained O'Neal Constructors, LLC,[1] to serve as the general contractor on a project to expand its facility. O'Neal entered into a Subcontract with HEMI for pipe installation. The original Subcontract price for HEMI's work was $8,748,669.00, but this price included $852,879.76 for "direct purchase" items that would be purchased directly from HEMI's vendors. Subcontract [66-2] at 1; Def.'s Mem., Ex. B [132-2] at 37–38. Thus, the amount O'Neal originally agreed to pay HEMI under the Subcontract was $7,895,789.24. The parties agreed that this Subcontract price was "firm, and [was] not subject to escalation or change, except by written change order." Subcontract [66-2] at 4.

During the project, O'Neal approved nine change orders that totaled $1,957,049.40. Pl.'s Arbitration Claim [132-1] at 34; Def.'s Mem., Ex. B [132-2] at 41–43. Thus, the Subcontract price, as amended by approved change orders, totaled $9,852,838.64 (hereafter referred to as "Adjusted Subcontract Price"). When the project concluded, O'Neal still owed HEMI $1,353,168.07 of the Adjusted Subcontract Price. Pl.'s Resp., Ex. B [135-2] at 2; Pl.'s Resp., Ex. C [135-3] at 2.

However, HEMI claims that O'Neal failed to pay it for additional labor and materials costs incurred due to project delays, changes, and extended duration. HEMI grouped these additional claims into six categories: (1) "Piping Material Quantity Increases," (2) "Outstanding Discrete Change Orders," (3) "Increased

---

[1] The Court denied Calgon's [20] Motion for Leave to File a Third-Party Complaint against O'Neal for subrogation.

General Conditions Costs Associated with Extended Project Duration," (4)

"Increased Craft Labor Costs," (5) "Overtime Costs,"(6) and "Outstanding Invoices

for Labor, Equipment & Materials for Project Commissioning." Pl.'s Resp., Ex. A

[135-1] at 2–3. HEMI's Chief Executive Officer, Michael Ahern, testified:

> All of the labor and materials costs referenced above were performed
> pursuant to the Subcontract and, as with prior O'Neal-approved and
> paid change orders, were implemented pursuant to the Subcontract's
> provisions addressing changes in the work.

*Id.* at 4. Phillip Honea, who served as O'Neal's Manager of Field Services and

"Vice-President-Process Chemicals" during the Calgon project, and HEMI's Chief

Financial Officer, Cassie Castillo, have testified by affidavit that "the HEMI Claims

as finally priced by HEMI totaled $7,173,683.28, not including fees and interest."

Pl.'s Resp., Ex. B [135-2] at 2; Pl.'s Resp., Ex. C [135-3] at 2. In an attempt to

recoup these alleged damages, HEMI filed a $6,256,867.00 lien on Calgon's property

pursuant to Miss. Code Ann. § 85-7-403. It also filed an arbitration claim against

O'Neal.

On October 19, 2023, O'Neal also sent a letter to O'Neal, in which it

demanded payment of "Outstanding Invoices" that HEMI viewed as "undisputed

and approved." Pl.'s Resp., Ex. 2 to Ex. A [135-1] at 65. These "Outstanding

Invoices," which totaled $1,752,320.36, "included $540,445.30 for the unpaid T&M

invoices, along with $404,657.56 for Subcontract progress invoices 22077.13 and

22077.14 and $807,217.50 for Subcontract retainage per invoice 22077.15." Pl.'s

Resp., Ex. B [135-2] at 2; Pl.'s Resp., Ex. C [135-3] at 2.[2]  The T&M invoices were #23047.01A for $384,232.46; #23047.02 for $137,319.92;  and #23047.03 for $18,892.92.  Pl.'s Resp., Ex. 2 to Ex. A [135-1] at 65.

Mr. Ahern claims that, "on November 2, 2023, O'Neal conceded in writing that $1,454,548.40 of the $1,752,320.26 Outstanding Invoice amount was undisputed and overdue."  Pl.'s Resp., Ex. A [135-1] at 4.[3]  O'Neal and HEMI subsequently entered into a Partial Settlement Agreement in which O'Neal agreed to pay HEMI $1,454,548.40, while also agreeing to reserve rights and continue negotiating the balance of $297,771.86 and the other unresolved costs . . . ."  *Id.*; Pl.'s Resp., Ex. D [135-4].

Mr. Honea and Ms. Castillo have testified that "HEMI appears to have underbilled O'Neal by $141,293.01 at the time the Partial Settlement Agreement was executed."  Pl.'s Resp., Ex. B [135-2] at 3; Pl.'s Resp. [135-3] at 3.  They explain:

As noted previously, HEMI's Subcontract balance, before resolution of the HEMI Claims and T&M Invoices, was $1,353,168.07[;] however HEMI only invoiced O'Neal $404,657.56 for progress invoices 22077.13 and 22077.14 and $807,217.50 for retainage per invoice 22077.15,

---

[2] Invoice 22077.13 was for $352,598.77, and Invoice 22077.14 was for $52,058.70. Pl.'s Resp., Ex. 2 to Ex. A [135-1] at 65.  The term "T&M Invoices" refers to invoices "for certain additional work requested by O'Neal to assist in finalizing and turning over the Project . . . , which were not yet approved at completion."  Pl.'s Resp., Ex. C [135-3] at 2.

[3] O'Neal disputed Invoice 23047.01A to the extent that HEMI included $72,308.69 in overhead costs, as well as Invoice 23047.02 to the extent it included $65,038.71 for overhead costs.  It appears that O'Neal disputed additional invoices, but one page is missing from the exhibit produced by HEMI.  *See* P.'s Resp., Ex. 3 to Ex. A [135-1] at 81.  In addition, O'Neal's alleged concession that it owed $1,454,548.40 of the funds sought is not included in the portion of the exhibit provided to the Court.

which is $141,293.01 less than O'Neal had approved for payment to
HEMI prior to entering into the two subsequent Settlement
Agreements . . . .

*Id.* at 3.[4]  The sum of Invoices 22077.13, 22077.14, and 22077.15, plus the

$141,293.01 "underbilled" amount equals $1,353,168.07.  As explained previously,

this amount undisputedly remained due and owing when the project concluded.  In

other words, this amount is part of the Adjusted Subcontract price.

After receiving two payments from O'Neal pursuant to the Partial Settlement

Agreement, HEMI reduced its lien on Calgon's property to $5,907,809.81.  Soon

afterwards, on January 31, 2024, HEMI filed the present lawsuit against Calgon for

enforcement and foreclosure of its lien.

On March 19, 2024, HEMI and O'Neal entered into a Final Settlement

Agreement, in which O'Neal agreed to pay HEMI an additional $3,500,000.00, plus

$300,000.00 in interest.  O'Neal would also owe additional interest if it failed to pay

HEMI the agreed upon $3,800,000.  Pl.'s Resp., Ex. A [135-1] at 6.  Mr. Ahern

testified, "HEMI did not agree to release Calgon Carbon.  HEMI's lien claim

remained in place, this action – filed in January 2024 – remained pending, and

HEMI did not release Calgon Carbon, its mechanic's lien or this litigation in any

way."  *Id.*

---

[4] Mr. Ahern testified that these invoices, which were included in the category
"Outstanding Invoices," were for "Subcontract work completed as well as prior-
approved Subcontract change order work that were uncompensated at the time
HEMI completed all of its work."  Pl.'s Resp., Ex. A [135-1] at 3–4.

On May 30, 2024, O'Neal claimed insolvency and stopped making payments pursuant to the two Settlement Agreements. Mr. Ahern has testified that O'Neal owed HEMI "not less than a total of $3,954,548.40" when it defaulted under the Settlement Agreements. *Id.* at 7. He states that O'Neal had paid $800,000.00 pursuant to the Partial Settlement Agreement[5] and $500,000.00 pursuant to the Final Settlement Agreement, which equals $1,300,000.00.

HEMI filed a second arbitration complaint against O'Neal, in which it sought recovery under the Settlement Agreements. O'Neal made a $763,812.53 payment to HEMI on November 8, 2024, after it received a large payment from another contractor. O'Neal filed a Chapter 7 bankruptcy petition before an arbitration hearing could be held. Mr. Ahern explains that O'Neal filed its bankruptcy petition on the ninetieth day following its last payment to HEMI, so "this payment may be subject to disgorgement by HEMI pursuant to the 90-day preference period . . . ." *Id.* at 19.

In late 2024 and early 2025, HEMI and Calgon filed cross-motions for summary judgment. In support of HEMI's Motion for Summary Judgment, Mr. Ahern testified by declaration that, as of December 16, 2024, O'Neal owed HEMI "$5,071,883.87 under the Subcontract for the work it performed, and the labor,

---

[5] Ms. Castillo, Mr. Ahern, and Mr. Honea testified that the Partial Settlement Agreement addressed the T&M invoices and three progress invoices. However, Ms. Castillo testified that HEMI did *not* apply payments made pursuant to the Partial Settlement Agreement toward those invoices. Pl.'s Resp., Ex. A [135-1] at 4; Ex. B [135-2] at 3; Ex. C [135-3] at 3, 5. She has not identified how those payments were applied.

services, and materials it provided, on the Project." Ahern 1st Dec. [60-1] at 3–4.

However, in opposition to Calgon's first Motion for Summary Judgment, Mr. Ahern

provided a second declaration dated March 31, 2025, in which he provided the

following totals for each category of damages:

> (1) Quantity Increases | $1,448,246.12;
> (2) Discrete Pending Change Orders | $367,107.82;
> (3) Extended Labor and Equipment Costs | $2,687,249.05;
> (4) Craft Labor Cost Increases | $1,828,695.24;
> (5) Overtime Costs | $544,613.09; and
> (6) Outstanding Invoices | $297,771.96

Pl.'s Resp., Ex. A [135-1] at 7–13. These amounts, which total $7,173,683.28, are

apparently out-of-date because they were presented to O'Neal at a March 2024

mediation, and Mr. Ahern testified that O'Neal made additional payments after the

March 2024 mediation.

In a [105] Memorandum Opinion and Order, the Court denied HEMI's

Motion for Summary Judgment because it failed to satisfy its initial summary-

judgment burden. The Court granted Calgon's first Motion for Summary Judgment

"to the extent that HEMI seeks costs related to piping material increases, extended

and increased labor and equipment costs, increased craft labor costs, and overtime

costs," and it denied the Motion in all other respects. Mem. Op. & Order [105] at

25.

HEMI has now filed a Motion for Reconsideration of the Court's

[105] Opinion to the extent that it granted partial summary judgment in favor of

Calgon. In the alternative, HEMI seeks permission to file an interlocutory appeal of

the Court's [105] Opinion. After the close of discovery, Calgon filed a second Motion

for Summary Judgment as to HEMI's remaining claims for payment of "Outstanding Invoices" and "Outstanding Discrete Change Orders."  Def.'s Mem. [132] at 1.[6]  Since the issues presented in these Motions overlap, the Court will consider these three Motions together.

## DISCUSSION

## I.    HEMI'S MOTION FOR RECONSIDERATION

"[B]efore a court enters a final judgment, it may reconsider its interlocutory orders under Rule 54(b)."  *Pace v. Cirrus Design Corp.*, No. 3:22-CV-685-KHJ-MTP, 2025 WL 1474820, at *1 (S.D. Miss. May 22, 2025) (quoting *Cabral v. Brennan*, 853 F.3d 763, 766 & n.3 (5th Cir. 2017)).  Under Rule 54(b), "the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law."  *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 336 (5th Cir. 2017) (citing Fed. R. Civ. P. 54(b)).

### A.    BURDEN OF PROOF ON SUMMARY JUDGMENT

HEMI argues that the Court's prior [105] Opinion "fails to delve into South Carolina's specific interpretive principles, particularly as they apply to the non-movant in a summary judgment context."  Pl.'s Reply [130] at 7.  However, federal courts sitting in diversity must apply the federal procedural rules "including the

---

[6] HEMI's argument that the Court has previously ruled on the issues presented in Calgon's second Motion is not well taken.  Calgon filed its second Motion for Summary Judgment after obtaining new testimony from HEMI's Rule 30(b)(6) designee that clarified the amounts due under the Subcontract.

federal summary judgment standard." *Brock v. Chevron U.S.A., Inc.*, 976 F.2d 969, 971 (5th Cir. 1992) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)); *see also Doe v. Doe*, 941 F.2d 280, 287 (5th Cir.), *on reh'g in part*, 949 F.2d 736 (5th Cir. 1991) ("Federal courts—irrespective of diversity—are to employ the summary judgment standard of Fed. R. Civ. P. 56."). The Fifth Circuit has provided the following discussion of that standard:

> Our standard is well settled: Summary judgment is proper if the party moving for such a judgment establishes that there is an absence of genuine issues of material fact. Once a movant has made such a showing, the nonmovant must establish each of the challenged essential elements of its case for which it will bear the burden of proof at trial. Although the nonmovant may satisfy this burden by tendering depositions, affidavits, and other competent evidence, mere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment. In short, the adverse party's response must set forth specific facts showing that there is a genuine issue for trial. Where the nonmoving party fails to make such a showing and the moving party has met its summary judgment burden, the latter is entitled to summary judgment as a matter of law.

*Brock*, 976 F.2d at 970–71 (citation modified). "Where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *In re La. Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017).

"A mechanic's lien claimant must prove the existence of a contract with the owner or the owner's agent and the relevant terms and conditions of that contract." 53 Am. Jur. 2d Mechanics' Liens § 373. "[T]he claimant has the burden of presenting evidentiary facts proving a right to the lien, the validity of the lien, that

the claim was timely filed within the statutory period, and that there are funds due and owing to which the lien can attach." *Id.* § 372 (citation modified). "[T]he property owner bears no burden to negate that entitlement." *Id.* On the other hand, "[t]he burden of proof in the strict sense is on the defendant to establish an affirmative defense to the lien." *Id.* § 374.

### B.    APPLICATION OF THE MISSISSIPPI LIEN STATUTE

HEMI imposed its $5,907,809.81 lien on Calgon's property pursuant to a Mississippi statute that grants subcontractors "a special lien on the real estate or other property for which they furnish labor, services or materials." Miss. Code Ann. § 85-7-403(1). The statute provides, "Each special lien specified in subsection (1) of this section shall be limited to *the amount due and owing the lien claimant under the terms of its express or oral contract, subcontract or purchase order* subject to Section 85-7-405(4)." *Id.* § 85-7-403(3) (emphasis added). "In no event shall the aggregate amount of liens created by Section 85-7-403 exceed the contract price as determined by the terms of the contract or other agreement between the owner and contractor for the improvements made or services performed." *Id.* § 85-7-405(4).

After reviewing cases from other jurisdictions and the plain language of the statute,[7] the Court previously made an *Erie* guess that "the Mississippi Supreme Court would find that overhead, delay, and other similar damages can be included

---

[7] Courts are required to apply the plain meaning of a Mississippi statute if its language is clear and unambiguous. *Watson v. Oppenheim*, 301 So. 3d 37, 41 (Miss. 2020).

in a lien only when those damages are permitted under the terms of the contract."
Mem. Op. & Order [105] at 6–7.  Thus, "the amount of the lien is determined by the
terms of the contract."  *Id.* at 7.  In other words, a lien statute "clearly contemplates
that recovery is based on the value of the contract less amounts already paid."  *Erb
Lumber Co. v. Homeowner Constr. Lien Recovery Fund*, 522 N.W.2d 917, 919 (Mich.
Ct. App. 1994).

Furthermore, the fact that "a claim for additional compensation might be
allowable under a contract or subcontract does not mean that the costs or damages
associated with that claim can be included in a mechanic's lien."  Timothy W.
Gordon, *Deciding Whether to Include "Claims" in Your Lien*, 37 Constr. Law., 22
(2017).  For example, "[a] mechanics' lien cannot be made the basis of recovery of
unliquidated damages for breach of contract.  Moreover, a mechanic's lien
proceeding is not intended to settle the contractual obligations of the parties."
*Artsmith Dev. Grp., Inc. v. Updegraff*, 868 A.2d 495, 496 (Pa. Super. Ct. 2005)
(citation modified); *see also Sea Pines Co. v. Kiawah Island Co.*, 232 S.E.2d 501, 503
(S.C. 1977) ("[A] mechanic's lien under the statute is not a vehicle for collecting
damages for breach of contract.").  Thus, the pertinent inquiry here is whether the
funds HEMI seeks are specifically provided for in the Subcontract.

### C.    WHETHER HEMI'S CLAIMS ARE PERMITTED UNDER THE TERMS OF THE SUBCONTRACT

While Mississippi law governs interpretation of the lien statute, the
Subcontract's choice of law provisions requires the Court to apply South Carolina
law when interpreting its terms.  The South Carolina Supreme Court has held that

"[t]he cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." *Schulmeyer v. State Farm Fire & Cas. Co.*, 579 S.E.2d 132, 134 (S.C. 2003). "Basic contract law provides that when a contract is clear and unambiguous, the language alone determines the contract's force and effect." *Lewis v. Premium Inv. Corp.*, 568 S.E.2d 361, 363 (S.C. 2002). In other words, "if the language is perfectly plain and capable of legal construction, it alone determines the document's force and effect." *Ecclesiastes Prod. Ministries v. Outparcel Assocs.*, 649 S.E.2d 494, 498 (S.C. Ct. App. 2007). "The question of whether a contract is ambiguous is a question of law. A contract is ambiguous when it is capable of more than one meaning or when its meaning is unclear." *N. Am. Rescue Prods., Inc. v. Richardson*, 769 S.E.2d 237, 240 (S.C. 2015) (citation modified).

O'Neal and HEMI agreed that the Subcontract price was "firm, and [was] not subject to escalation or change, except by written change order." Subcontract [66-2] at 4.

Section 8 of the Subcontract provides that O'Neal may make changes to the work agreed upon "by issuance of a Subcontract Change Order or Change Directive." *Id.* at 14. That Section sets forth procedures and limitations for obtaining change orders. Regarding delays and interference by other subcontractors, the parties agreed, "Contractor will write additive/deductive change order to responsible parties for all substantiated claims." *Id.* at 16. Finally, Section 16(J) of the Subcontract provides:

-12-

> Notwithstanding anything herein to the contrary, neither party shall be responsible or held liable to the other party for any indirect, incidental, liquidated, special or consequential damages of any nature whatsoever arising out of or relating to this Agreement or the work or services to be provided by Subcontractor hereunder, *including without limitation . . . increased expenses . . .* , however the same may be caused, all such claims being expressly waived by the parties.

*Id.* at 22 (emphasis added). Thus, the Subcontract does not contain any language providing that HEMI may recover additional expenses caused by delay and project changes. In fact, when considered as a whole, the Subcontract language prevents HEMI from recovering the increased expenses it seeks in this lien enforcement action.

### 1.    Increased Expenses under Section 16(J)

HEMI argues that the Court erred in interpreting Section 16(J) to provide for waiver of "increased expenses." *See* Subcontract [66-2] at 22.[8] It claims that "increased expenses" are only waived to the extent that they also constitute "consequential damages." In support of this argument, HEMI cites a Colorado breach-of-contract case in which the parties had

> waived claims for consequential damages arising out of or relating to the contract. The waiver included damages incurred by [the contractor] for, among other things, loss of financing, lost profits, and extended general conditions, except anticipated Contractor's Fee arising directly from the Work.

---

[8] The Court previously addressed HEMI's arguments related to waiver of Section 16(J), affirmative defenses, and third-party beneficiaries in its prior [105] Opinion, which is incorporated herein by reference. Furthermore, HEMI's arguments related to Section 16(J) cannot be used to enlarge its recovery in a statutory lien action that is limited to the contract terms. Those arguments are more applicable to a breach-of-contract action.

*Turner Constr. Co. v. CCN Lodging LLC*, No. 21CA0844, 2022 WL 22926706, at *2
(Colo. App. Dec. 29, 2022) (citation modified). The owner argued that the clause
"unambiguously preclude[d] an award of extended general condition damages," but
the contractor asserted that the "provision precludes only those extended general
condition damages that constitute consequential damages." *Id.* at *8. The court
explained:

> "Consequential damages" is a legal term of art that describes losses
> that do not flow directly and immediately from an injurious act but
> that result indirectly from the act. These damages, sometimes referred
> to as "special damages" are distinct from general damages, which are
> damages that arise naturally from the breach of contract itself.

*Id.* (citation modified). The court noted that "the contract explicitly provide[d] that
the contractor is entitled to its cost of work for any approved delay[.]" *Id.* at 9.
However, the project owner argued that the contract's waiver of consequential
damages provision "effectively operate[d] as a 'no damages for delay' clause." *Id.* As
a result, the court held that the waiver clause was ambiguous. *Id.*

The *Turner* case is distinguishable for at least two reasons. First, *Turner*
was a breach-of-contract case, while the present case is a lien enforcement action.
As explained previously, damages that are available in a breach-of-contract case are
not necessarily available in a statutory lien enforcement action. Second, the
Subcontract at issue here does not "*explicitly* provide[ ] that [HEMI] is entitled to its
cost of work for any approved delay." *See id.* HEMI and O'Neal merely agreed to
delete language that would have prohibited HEMI from receiving damages caused
by delay and project changes. They did not add any language allowing recovery of

those damages.

Furthermore, the Court construes the phrase "increased expenses" in Section 16(J) as "illustrative and not limitative" of the preceding categories, such as "consequential damages." *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (citation modified) (construing and discussing the phrase "including without limitation"); *see also Krepps v. NIIT (USA), Inc.*, No. 11 C 8787, 2014 WL 273780, at *4 n.8 (N.D. Ill. Jan. 24, 2014) (quoting Antonin Scalia & Bryan A. Garner, Reading Law 176–77) (explaining that "including without limitation" is generally used to "include words that add nothing of substance, either out of a flawed sense of style or to engage in the ill-conceived but lamentably common belt-and-suspenders approach."); *Salisbury W. Condo. Tr. v. Travelers Cas. & Sur. Co. of Am.*, No. 13-CV-40051-TSH, 2013 WL 6092446, at *7 (D. Mass. Oct. 15, 2013), *report and recommendation adopted*, No. 4:13-CV-40051, 2013 WL 6092203 (D. Mass. Nov. 18, 2013) ("[I]ncluding without limitation illustrates, clarifies, emphasizes, and ensures that the party to whom information is communicated understands the absence of boundaries and limits"); *Doerbecker v. Cnty. of Nassau*, No. CV 12-2204 LDW ARL, 2013 WL 2237574, at *2 (E.D.N.Y. May 21, 2013) ("The use of the phrase 'including without limitation' is plainly illustrative rather than exhaustive."). As a result, "increased expenses" are an example or illustration of "indirect, incidental, liquidated, special or consequential damages" that are waived under the terms of the Subcontract. HEMI's arguments concerning Section 16(J) are not well taken.

## 2. Interpretation of the Subcontract in Light of the Mississippi Lien Statute

Nevertheless, even if HEMI's increased expenses were not consequential or special damages barred by the Subcontract, they are not "due and owing . . . under the terms of" the Subcontract.  *See* Miss. Code Ann. § 85-7-403(3).  For example, HEMI has admitted that it "was required to perform more work and provide more labor, services, and materials to the Project *than originally required and contemplated under the Subcontract*."  Pl.'s Mem. [82] at 8 (emphasis added).  While HEMI may be able to recover those expenses in a breach-of-contract case against O'Neal, it cannot recover those expenses in a statutory lien action against Calgon.  *See, e.g., Sea Pines Co.*, 232 S.E.2d at 503.  Thus, the Subcontract unambiguously precludes an increase in the Subcontract price except by approved change order.

### D. EFFECT OF DELETED PROVISIONS IN THE SUBCONTRACT

HEMI claims that the Court is required to give weight to language that HEMI and O'Neal deleted from the Subcontract because, under South Carolina law, "the intention of the parties must be inferred from the contents of the whole agreement and not from any one of its several parts."  Pl.'s Mem. [114] at 21 (quoting *Martin v. Carolina Water Serv., Inc.*, 312 S.E.2d 556, 558 (S.C. Ct. App. 1984)).  In addition, HEMI argues:

> The Subcontract was heavily negotiated and modified, intentionally. Deleting those provisions that prohibited HEMI from recovering costs and damages directly shows the parties' intent to allow such claims to proceed.  The deletions are direct evidence that the parties to the Subcontract agreed that HEMI could recover those costs and damages. Those recoverable costs include those resulting from delays and/or alterations to the schedule.

*Id.* at 20.

As the Court previously explained, "HEMI is seeking recovery based on deletions from the Subcontract instead of its terms." Mem. Op. & Order [105] at 20. Under South Carolina law, the parol evidence rule prevents extrinsic evidence from being introduced to create an ambiguity when the contract is otherwise unambiguous. *Beaufort Cnty. Sch. Dist. v. United Nat'l Ins. Co.*, 709 S.E.2d 85, 95 (S.C. Ct. App. 2011). This includes "the introduction of extrinsic evidence of agreements or understandings contemporaneous with or prior to execution of a written instrument when the extrinsic evidence is to be used to contradict, vary or explain the written instrument." *McGill v. Moore*, 672 S.E.2d 571, 576 (S.C. 2009).

In addition, while the South Carolina courts have not directly addressed the issue of whether deleted contract provisions should be considered when interpreting an unambiguous agreement, most courts have classified deleted provisions as extrinsic evidence governed by the parol evidence doctrine. *G&G Mech. Constructors, Inc. v. Jeff City Indus., Inc.*, 549 S.W.3d 492, 497 (Mo. Ct. App. 2018) (citation modified) ("A general rule of contract interpretation or construction is that stricken language is extrinsic and may not be resorted to in construing a contract."); *see also RTC Mortg. Tr. 1995-S/N1 v. J.I. Sopher & Co.*, No. 96 CIV. 4992 (DC), 1998 WL 132815, at *3 (S.D.N.Y. Mar. 24, 1998) (finding that "crossed out and stricken . . . words are not part of the agreement and cannot be relied on to create ambiguity"); *Valassis Commc'ns, Inc. v. Aetna Cas. & Sur. Co.*, 97 F.3d 870, 873 (6th Cir. 1996) ("[A] court must not consider the deleted language in its interpretation of

the remaining agreement."); *Ryan v. Mountain States Helicopter, Inc.*, 686 P.2d 95, 99 (Idaho Ct. App. 1984) ("[E]xtrinsic indicia of the parties' intent may be considered in construing a contract only if the language remaining in the contract, after deletions, is ambiguous."); *but see Hou. Expl. Co., v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 470 (Tex. 2011) ("Ignoring struck-through provisions 'not only ignores but distorts the negotiation process . . . .'").  Given the South Carolina courts' treatment of parol evidence, the Court predicts that they would join the majority of jurisdictions in finding that deleted language cannot be considered to create ambiguity in a contract.

Finally, the fact that O'Neal and HEMI deleted language that would have prohibited recovery of certain damages does not mean that HEMI is *entitled to* recover those damages.  HEMI was merely given the opportunity to request those damages, not the right to receive them.  Therefore, HEMI's arguments related to deletions are not well taken.  The only means of increasing the Subcontract price is provided for in Section 8 of the Subcontract, which pertains to change orders.  The Subcontract, as revised, does not contain any other language specifically providing for an increase in the Subcontract price due to delay, project changes, or disruption of HEMI's work.  Precontract negotiations, the conduct of the parties, and deleted language cannot be admitted to create ambiguity.

### E.    WHETHER HEMI AND O'NEAL ORALLY MODIFIED THE SUBCONTRACT

HEMI claims, "The Subcontract was either modified by oral agreement and/or conduct, or the extracontractual work constituted a separate agreement,

manifested by words, oral or written, or by conduct, and supported with consideration." HEMI's Mem. [114] at 18. It further asserts, "Oral modifications are valid under South Carolina law, supported by consideration, allowing HEMI to recover costs for such changes." *Id.* at 26. HEMI has not presented any evidence or testimony supporting its assertions that the parties orally agreed to modify the Subcontract to include the additional costs it now seeks.

### F.   EFFECT OF WORK CONTINUATION CLAUSE

HEMI next claims that the Court's prior [105] Opinion "ignores change order directives." Pl.'s Mem. [114] at 26 (capitalization omitted).[9] HEMI cites "Section 3(F)" of the Subcontract, but the language it quotes is in Section 7(F), which provides:

> <u>Work Continuation:</u> Subcontractor agrees to continue the diligent performance of the Work and to proceed in accordance with the directives of Contractor, under protest, in the event of a dispute or controversy of any nature. Failure to so proceed shall constitute a material breach of the Subcontract, regardless of the ultimate outcome of the dispute, it being understood and agreed that any controversy between the parties shall not constitute a basis to delay suspend, disrupt, or hinder the Work.

Subcontract [66-2] at 13. HEMI argues that it was

> contractually obligated to follow O'Neal's directives, even if not in writing. To state the obvious, the parties did not intend for HEMI's additional work to be without compensation. Oral modifications are valid under South Carolina law, supported by consideration, allowing HEMI to recover costs for such changes.

Pl.'s Mem. [114] at 26.

---

[9] The Court has not located any argument concerning change order directives in HEMI's prior submissions.

The Work Continuation provision pertains to disputes between the parties, but HEMI claims that it orally agreed with O'Neal to modify the Subcontract. Unfortunately, HEMI has not provided any evidence or testimony in support of its new claim of an oral agreement, and it has not provided any case law supporting its apparent claim that the Work Continuation provision permits an increase in the Adjusted Subcontract price.

### G.    EFFECT OF HEMI'S SETTLEMENTS WITH O'NEAL

HEMI asserts two new arguments: (1) its settlements with O'Neal constitute a "[f]inal [a]mendment" to the Subcontract, HEMI's Mem. [114] at 27;[10] and (2) "[i]n essence, HEMI is enforcing the Settlement Agreements through this action." HEMI's Sur-reply [144] at 3.[11]  Thus, HEMI claims it is entitled to "at least $3,612,290.09 under these Agreements, potentially increasing to $4,376,102.62 if a payment must be returned to the bankruptcy trustee, plus interest, attorney's fees, and litigation costs."  Pl.'s Sur-reply [144] at 3.  Ms. Castillo and Mr. Honea have testified that "HEMI and O'Neal negotiated two (2) settlement agreements to resolve the unpaid Subcontract balance, HEMI's Claims and the T&M Invoices . . . ,

---

[10] Despite the alleged amendment of the Subcontract via settlement, HEMI subsequently filed a $7,173,683.28 proof of claim in O'Neal's bankruptcy action. *See* HEMI's Proof of Claim, *In re O'Neal Constructors, LLC*, No. 6:25-bk-459-hb (Bankr. D.S.C. June 30, 2025).

[11] HEMI filed its lien on Calgon's property on August 18, 2023.  HEMI and O'Neal entered into the Partial Settlement Agreement on November 29, 2023.  HEMI amended its lien on January 18, 2024.  HEMI filed this lawsuit on January 31, 2024.  HEMI and O'Neal entered into the Final Settlement on March 19, 2024. HEMI did not amend the lien or amend its Complaint after the Final Settlement.

*which by their terms were amendments to the Subcontract.*"  Pl.'s Mem., Ex. B [135-2] at 2–3; Pl.'s Mem., Ex. C [135-3] at 2–3 (emphasis added).

As a result, the Court must analyze the language of the two Settlement Agreements, both of which are governed by South Carolina law.  *See* Partial Settlement [49-2] at 5 ("The governing law and dispute resolution provisions of the Subcontract are incorporated mutatis mutandis."); Final Settlement [49-3] at 7 (same); Subcontract [66-2] at 21 (providing that South Carolina law governs "the interpretation and enforceability of this Subcontract").

"In South Carolina jurisprudence, settlement agreements are viewed as contracts."  *Pee Dee Stores, Inc. v. Doyle*, 672 S.E.2d 799, 802 (S.C. Ct. App. 2009); *see also Ecclesiastes Prod. Ministries*, 649 S.E.2d at 501 ("A release is a contract and contract principles of law should be used to determine what the parties intended."). Under South Carolina law,

> [w]hen a contract is unambiguous, clear and explicit, it must be construed according to the terms the parties have used, to be taken and understood in their plain, ordinary and popular sense.  Extrinsic evidence giving the contract a different meaning from that indicated by its plain terms is inadmissible.

*C.A.N. Enters., Inc. v. S.C. Health & Hum. Servs. Fin. Comm'n*, 373 S.E.2d 584, 586 (S.C. 1988) (citation modified).

Calgon argues that the Settlement Agreements are inadmissible under Rule 408(a) of the Federal Rules of Evidence, which provides that evidence of settlement negotiations and agreements "is not admissible--on behalf of any party--either to prove or disprove the validity or amount of a disputed claim . . . ."  However, Rule

-21-

408(b) provides an exception allowing courts to admit evidence of settlement

agreements and negotiations "for another purpose, such as proving a witness's bias

or prejudice, negating a contention of undue delay, or proving an effort to obstruct a

criminal investigation or prosecution."  Fed. R. Evid. 408(b).

> HEMI argues,
>
> By its plain text, Rule 408 is intended to protect a ***party*** from having
> its settlement negotiations or agreements used against it.  Calgon
> Carbon is not a party to the Settlement Agreements and was not a
> party to any of the settlement negotiations; therefore, it is outside the
> plain language of the rule.

Pl.'s Mem. [141] at 18 (emphasis in original).  However, the Fifth Circuit has stated:

> Even where the evidence offered favors the settling party and is
> objected to by a party not involved in the settlement, Rule 408 bars the
> admission of such evidence unless it is admissible for a purpose other
> than to prove liability for or invalidity of the claim or its amount.

*Kennon v. Slipstreamer, Inc.*, 794 F.2d 1067, 1069 (5th Cir. 1986) (citation

modified).  As a result, Calgon is not barred from arguing that the Settlement

Agreements are inadmissible.

In both Settlement Agreements, HEMI and O'Neal agreed, "This Agreement

and all negotiations leading up to the Agreement, *shall be deemed* within the

protection of Federal Rule of Evidence 408 and any analogous state-law principles

or rules."  Partial Settlement [49-2] at 3–4; Final Settlement [49-3] at 5 (emphasis

added).  Therefore, HEMI and O'Neal clearly and unambiguously agreed that the

Settlement Agreements would be deemed inadmissible to establish the validity or

amount of HEMI's claim.

### H.    CONCLUSION

HEMI's Motion for Reconsideration of the Court's prior [105] Opinion is denied.

All arguments not specifically addressed would not have changed the outcome.

## II.    CALGON'S SECOND MOTION FOR SUMMARY JUDGMENT

In its prior [105] Opinion, the Court explained:

> The two remaining categories of damages sought by HEMI are
> "outstanding discrete change orders" and "outstanding invoices for
> labor, equipment, and materials for project commissioning." Ahern
> Decl. [82-1] at 11, 13–14. Mr. Ahern testifies that the "outstanding
> discrete change orders" complied with Section 8 of the Subcontract,
> and he explains that O'Neal and HEMI were still negotiating these
> change orders when HEMI's work on the project concluded. He further
> testifies that O'Neal instructed HEMI to perform this work. The
> "outstanding invoices" include invoices for "outstanding original
> Subcontract work completed as well as prior-approved Subcontract
> change order work that were uncompensated at the time HEMI
> completed all of its work." *Id.* at 3–5. Therefore, a genuine issue of
> material fact exists regarding whether HEMI is entitled to include at
> least some portion of these costs in its lien.

Mem. Op. & Order [105] at 20–21. Now, Calgon seeks summary judgment

regarding HEMI's remaining claims.

### A.    HEMI'S CLAIM FOR "OUTSTANDING INVOICES"

HEMI issued the following invoices, which totaled $1,211,875.06, to O'Neal

for Subcontract work, a change order, and retainage: #22077.13 dated April 25,

2023, for $352,598.77; #22077.14 dated May 23, 2023, for $52,058.79; and #22077.15

dated May 23, 2023, for $807,217.50. Ms. Castillo and Mr. Honea have now

clarified that "HEMI appears to have underbilled O'Neal by $141,293.01 at the time

the Partial Settlement Agreement was executed." Pl.'s Mem., Ex. B [135-2], Ex. C

[135-3] at 3. Thus, O'Neal owed $1,353,168.07 of the Adjusted Subcontract Price

when the project concluded. Calgon does not dispute that those funds, to the extent they remain unpaid, would be recoverable under the lien statute.

Therefore, to avoid double-counting, the "Outstanding Invoices" category should be reduced by $1,211,875.06. This leaves the following "T&M invoices," which are disputed by Calgon: #23047.01A dated May 23, 2023, for $384,232.46; #23047.02 dated June 21, 2023, for $137,319.92; and #23047.03, dated July 20, 2023, for $18,892.92. These remaining invoices total $540,445.30. Mr. Ahern gave the following testimony regarding these "T&M invoices":

> At the time HEMI achieved mechanical completion of all its base scope and added scope work, O'Neal requested that HEMI provide additional labor, equipment and materials to assist O'Neal and Calgon Carbon in the commissioning and start-up of the Project, which work was not originally part of HEMI's Subcontract work.

Pl.'s Mem., Ex. A [135-1] at 3. HEMI has not provided any admissible evidence that supports its claim that the remaining invoices are due and owing under the terms of Subcontract. As a result, Calgon is entitled to summary judgment as to HEMI's claim for payment of "T&M invoices" totaling $540,445.30.

## B. "OUTSTANDING DISCRETE CHANGE ORDERS"

The last remaining category of damages sought by HEMI is "Outstanding Discrete Change Orders." Mr. Ahern testified that these change orders pertain to "[l]abor and materials costs associated with certain discrete, listed change orders that the parties were still negotiating at the time HEMI completed its Project work." Pl.'s Mem., Ex. A [135-1] at 2. HEMI originally sought $605,694.79 for this category, but it reduced the "discrete pending change orders" total to $367,107.82 to

reflect "updated analysis by HEMI in consultation with its experts." Pl.'s Mem., Ex. A [135-1] at 4, 11. It is unclear from the record where those reductions were made.

HEMI's "Outstanding Discrete Change Orders" claim pertains to seventeen field change orders (FCOs): FCO 10, 29, 54, 71A, 71B, 84, 106, 109, 127, 128, 131, 142, 143, 150, 164R1, 171, and 179. HEMI's AAA Claim [132-3] at 35. HEMI has never provided the amount of FCO 71B. *See id.*

HEMI concedes that two of the field change orders—FCO 10, which was for $33,470.48, and FCO 164R1, which was for $31,596.49—"were incorporated into Subcontract Change Order No. 9." *Id.* at 14; Def.'s Mem. [132] at 9. The parties agree that Change Order No. 9 was Invoice 22077.14. As a result, this invoice was included in the Adjusted Subcontract price, the "Outstanding Invoices" category, and the "Outstanding Discrete Change Orders" category of HEMI's damages claim. Since these FCOs 10 and 164R were incorporated into an approved change order included in the Adjusted Subcontract Price, those FCOs should not be included in the "Outstanding Discrete Change Orders" category.

HEMI's Rule 30(b)(6) deponent, Steve Harker, testified that the change order log for the project indicates that FCOs 29 and 132 were omitted and that FCO 84 was declined by O'Neal. Def.'s Mem., Ex. B [132-2] at 103–04, 116–17; *see also* Def.'s Mem., Ex. K [132-11]. HEMI now claims that its Rule 30(b)(6) designee was uncertain when he responded to questions about FCOs 29, 84, 132. But HEMI has not provided any admissible evidence or testimony to the contrary. Furthermore,

> [w]hen a corporation produces an employee pursuant to a rule 30(b)(6) notice, it represents that the employee has the authority to speak on

> behalf of the corporation with respect to the areas within the notice of deposition.  This extends not only to facts, but also to subjective beliefs and opinions.  If it becomes obvious that the deposition representative designated by the corporation is deficient, the corporation is obligated to provide a substitute.

*Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir. 2006) (citation modified).

As for the remaining FCOs, Calgon claims "HEMI has not produced any information in discovery to show that Field Change Orders Nos. 54, 71A, 106, 109, 127, 128, 142, 143, 150, 171 and 179 were approved by O'Neal."  Def.'s Mem. [132] at 10.  HEMI responds that "[t]his is a bald statement without any citation to any factual support, and it is incorrect.  Among other things, HEMI produced the Settlement Agreements in discovery."  Pl.'s Mem. [141] at 15.

Contrary to HEMI's assertion, Calgon is permitted to raise the absence of admissible evidence supporting HEMI's claims in a motion for summary judgment.  *See in re La. Crawfish Producers*, 852 F.3d at 462 ("Where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.").  Once again, for the reasons stated previously, the Settlement Agreements are inadmissible.  As a result, there is no evidence supporting HEMI's claim that any of the FCOs were approved, aside from those incorporated into Change Order No. 9, which is included in the Adjusted Subcontract Price.

C. **WHETHER HEMI HAS BEEN FULLY COMPENSATED FOR AMOUNTS DUE "UNDER THE TERMS OF THE SUBCONTRACT"**

Since there is no admissible evidence supporting further additions to the Adjusted Subcontract Price, the total amount owed to HEMI under the terms of the Subcontract equaled $9,852,838.64. At the conclusion of the project, O'Neal had paid HEMI $8,499,670.60. After HEMI filed its arbitration complaint, O'Neal paid HEMI the following amounts: $150,000.00 on November 30, 2023; $250,000.00 on December 20, 2023; $100,000.00 on January 30, 2024; $100,000.00 on February 29, 2024; $350,000.00 on March 29, 2024; $350,000.00 on April 29, 2024; and $763,812.53 on November 8, 2024. *See* Def.'s Mem., Ex. D [132-4]. Therefore, O'Neal has paid HEMI a total of $10,563,483.13. For purposes of the Mississippi lien statute under which HEMI seeks to recover, HEMI has been fully compensated under the terms of the Subcontract. All other damages sought are alleged breach-of-contract damages that are not recoverable under the Mississippi lien statute against a project owner.

D. **CONCLUSION**

As a result, the Court grants Calgon's Motion for Summary Judgment as to HEMI's remaining claims. All arguments not specifically addressed would not have changed the outcome.

III. **HEMI'S MOTION FOR INTERLOCUTORY APPEAL**

Since the Court has granted summary judgment in favor of Calgon, HEMI's Motion for permission to file an interlocutory appeal is moot.

## CONCLUSION

After thorough consideration of all the arguments, testimony, and evidence presented, the Court finds that HEMI's Motion for Reconsideration is not well taken; Calgon is entitled to summary judgment; and HEMI's request for an interlocutory appeal is moot.

**IT IS THEREFORE ORDERED AND ADJUDGED** that Calgon Carbon Corporation's [131] Motion for Summary Judgment is **GRANTED**.  The Court will enter a separate judgment as required by Fed. R. Civ. P. 58(a).

**IT IS FURTHER ORDERED AND ADJUDGED** that Plaintiff Heavy Equipment Movers and Installation, LLC's [113] Motion for Reconsideration is **DENIED**.

**IT IS FURTHER ORDERED AND ADJUDGED** that Plaintiff Heavy Equipment Movers and Installation, LLC's [113] Motion for Interlocutory Appeal is **MOOT**.

**SO ORDERED AND ADJUDGED** this the 13th day of March, 2026.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE